658 August 8, 2024 No. 28

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

STEPHANIE ANDREA ORTIZ,
*Respondent on Review.*

(CC 20CR23850) (CA A175738) (SC S070216)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 11, 2024.

Joanna L. Jenkins, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Peter G. Klym, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

BUSHONG, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

Duncan, J., concurred and filed an opinion.

James, J., concurred and filed an opinion, in which Masih, J., joined, and in which Duncan, J., joined through "Part I."

_____

* Appeal from Josephine County Circuit Court, Brandon S. Thueson, Judge. 325 Or App 134, 528 P3d 795 (2023).

**BUSHONG, J.**

At defendant's criminal trial on a charge of driving under the influence of intoxicants (DUII), the arresting officer described the two field sobriety tests (FSTs) that she had administered to defendant—the walk-and-turn and the one-leg-stand tests[1]—as "standardized" tests that are "designed to determine impairment" and supported by "studies conducted to prove their validity." Defendant did not object to that testimony, and a jury found her guilty of DUII. The Court of Appeals concluded that allowing that testimony constituted plain error because it was scientific evidence received without an adequate foundation, and the court exercised its discretion to reverse the conviction based on that error, concluding that it "was not harmless." *State v. Ortiz*, 325 Or App 134, 139, 142, 528 P3d 795 (2023).[2]

We allowed review to address the application of plain-error review in this context. As we will explain, most of the officer's testimony about the two FSTs was admissible. But even if receiving part of the officer's testimony constituted plain error—an issue that we need not decide—we conclude that the Court of Appeals abused its discretion in reversing based solely on its determination that the error was not harmless. That conclusion is not a legally sufficient basis for reversal on plain-error review under our prior cases and the Court of Appeals' own precedent. Accordingly, we reverse and remand to the Court of Appeals to consider the appropriate factors in exercising its discretion and, if necessary, address defendant's remaining assignment of error.

## I.   BACKGROUND

### A.   *Facts and Trial Proceedings*

We summarize the pertinent facts presented at trial to place our analysis of the disputed evidentiary issue in context.

---

[1] The walk-and-turn test involves taking nine heel-to-toe steps along a straight line, turning as instructed, and taking nine steps back along the same line in the same manner. The one-leg-stand test involves balancing on one leg for 30 seconds. *See* OAR 257-025-0020(1)(b), (c) (describing tests).

[2] The Court of Appeals did not consider defendant's other assignment of error, which concerned the admissibility of other testimony.

Based on a 9-1-1 call from a concerned citizen, Officer Miguel arrived at the scene where a white SUV was parked. Miguel approached defendant, who matched the caller's description of the SUV's driver. Miguel could smell alcohol on defendant's breath, observed that her eyes were "watery," and noticed that she exhibited mood swings ranging from anger, to crying, to laughing. Defendant told Miguel that she had consumed five beers that evening, that she felt a "little bit tipsy," and that she did not believe that she was safe to drive. However, defendant denied that she had been driving the vehicle.

Miguel then contacted the 9-1-1 caller to confirm that defendant had been driving and proceeded to investigate defendant for DUII. As part of that investigation, Miguel asked defendant to perform two FSTs: the walk-and-turn test and the one-leg-stand test. After observing defendant's performance on those tests, Miguel arrested defendant for DUII. At the police station, defendant agreed to take a breath test. That test, administered about one hour and 10 minutes after the 9-1-1 call that had started the investigation, indicated that defendant's blood alcohol content (BAC) was .07 percent.[3]

At trial, Miguel testified in some detail about the FSTs that she had administered. She first described her training at the police academy, which included a "full course" on "standardized field sobriety tests" that included a "wet lab," where trainees obtain hands-on experience administering the FSTs to individuals who have been drinking. She then described the tests:

"[PROSECUTOR]:   What are the purposes of the field sobriety tests?

"MIGUEL:   They are divided attention tests. They are designed to determine impairment.

"[PROSECUTOR]:   Okay. And what field sobriety tests did you perform on the [d]efendant?

---

[3]  A person commits the offense of DUII if the person has a BAC of .08 percent or more or is under the influence of intoxicating liquor when driving a vehicle. ORS 813.010(1). In this case, the state opted to proceed only on an "under the influence" theory of DUII.

"MIGUEL:   We performed the walk-and-turn test and the one-leg stand.

"[PROSECUTOR]:   Are those tests used by law enforcement around the country?

"MIGUEL:   Yes. Those are standardized tests.

"[PROSECUTOR]:   Why are those tests used around the country?

"MIGUEL:   Like I said, they are standardized. There have been studies conducted to prove their validity. * * * [I]t's a national standard, so it's not just something that I made up or anybody in my department made up. It is a national standardized test. It is conducted the same way, it has the same set of instructions, same set of rules for each person that performs that nationwide."

That testimony was received without objection.[4] Miguel then described how she administers the tests, the instructions she had given to defendant, and how defendant had performed. Miguel's bodycam footage, which showed her interview of defendant at the scene and defendant's performance on the FSTs, was also admitted into evidence and played for the jury.

Defendant testified at trial that her husband had been driving the white SUV immediately before Miguel arrived on the scene. Defendant admitted that she had been drinking earlier that evening and that she had told Miguel at the time that she had not felt safe to drive. In closing argument, defense counsel argued that the jury could find defendant not guilty of DUII either because the state had not proved beyond a reasonable doubt that defendant had been driving the vehicle, or because, even if the jury concluded that defendant had been driving, the state had not proved that defendant had been under the influence of intoxicating liquor. Among other things, defense counsel pointed out that defendant's BAC of .07 percent when she took the breath

---

[4] Miguel's testimony about the FSTs was elicited by questions from the prosecutor that did not require Miguel to describe the tests in scientific terms. The questions that elicited the objectionable testimony were as follows: (1) "Are those tests used by law enforcement around the country?"; and (2) "Why are those tests used around the country?" Phrased that way, the questions themselves were not objectionable, but defendant could have objected and moved to strike Miguel's answers for lack of foundation.

test was below the .08 percent standard, and he suggested that defendant's poor performance on the FSTs could have been caused by her emotional state or embarrassment, not intoxication.

The jury returned a guilty verdict. Defendant appealed.

B.  *Appellate Proceedings*

Defendant raised two assignments of error on appeal. The Court of Appeals did not consider the first assignment of error because it reversed on the second. *Ortiz*, 325 Or App at 137.[5] In that assignment of error, defendant challenged the trial court's admission of Miguel's testimony that the two FSTs she administered were "national[ly] standardized" tests that were "designed to determine impairment" and supported by "studies conducted to prove their validity." Defendant acknowledged that she had not preserved the error by timely objecting to that testimony, but she contended that the trial court had "plainly erred" by receiving that "scientific evidence" without requiring the state to lay a foundation for its admission.

The Court of Appeals agreed with defendant, concluding that the disputed testimony was scientific evidence under OEC 702,[6] and that the state was required to lay an adequate foundation addressing the factors in *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 299-306, 899 P2d 663 (1995), before the evidence could be admitted.[7] *Ortiz*, 325 Or App at 137-38.

———————

[5] Defendant asserted in her first assignment of error that the trial court had erred by allowing Officer Miguel to testify that defendant's performance on the FSTs was "consistent" with her observations and to compare defendant's performance on the FSTs to what she "would expect a sober person to do." Defendant objected at the end of that testimony based on "foundation and speculation," and the trial court overruled the objection. As noted, the Court of Appeals did not reach that assignment of error, and the parties did not raise that issue in this court.

[6] OEC 702 provides, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[7] The *Brown/O'Key* factors for admissibility of scientific evidence include the following: (1) whether the evidence is generally accepted in the field; (2) the expert's qualifications; (3) prior use of the evidence; (4) the potential rate of error; (5) the existence of specialized literature; (6) the novelty of the evidence; and

The court further concluded that, "[b]ecause the state did not attempt to lay an adequate *Brown/O'Key* foundation, it would be error for a trial court to admit" the testimony over an appropriate objection. *Id.* at 138. But, because defendant had not objected to that testimony at trial, the court turned to "whether it was plain error for the trial court to not recognize the testimony as obviously scientific testimony lacking a foundation and, accordingly, *sua sponte* exclude its admission into evidence." *Id.* at 139.

The court explained that, under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991), plain-error review "involves a two-step inquiry[.]" *Ortiz*, 325 Or App at 137. The court must "first determine whether the error is plain, and second, [decide] whether to exercise [its] discretion to consider the error." *Id.* Under the first step, the court must determine whether the error is (1) one of law, (2) obvious and not reasonably in dispute, and (3) "'apparent on the record without requiring the court to choose among competing inferences.'" *Id.* (quoting *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013)). The Court of Appeals concluded that the error in admitting Miguel's testimony about the FSTs was plain and that the trial court "had a duty to exclude the evidence." *Id.* at 139 (citing *State v. Beltran-Chavez*, 286 Or App 590, 614, 400 P3d 927 (2017); *State v. Eatinger*, 298 Or App 630, 448 P3d 636 (2019); and *State v. Reid*, 312 Or App 540, 492 P3d 728 (2021)).

Then, at the second step of the plain-error analysis, the court exercised its discretion to consider the error and reversed the conviction, "as [it had done] in *Reid*." *Ortiz*, 325 Or App at 140. The court explained that, "due to the inherently persuasive effect of scientific evidence and the prosecution's focus on the FST results in its closing argument," it could not "say that the testimony *** had little likelihood of affecting the verdict." *Id.* at 142. The court also observed that "it is difficult to see how the state could have laid an adequate *Brown/O'Key* foundation for Miguel to testify as a scientific expert had defense counsel objected to the

---

(7) the extent to which the evidence relies on the subjective interpretation of the expert. *O'Key*, 321 Or at 299 (citing *Brown*, 297 Or at 417). That nonexclusive list is not intended "to be taken as a mechanical checklist of foundational requirements." *Id.* at 300.

evidence." *Id.* Thus, the court concluded that the error "was not harmless." *Id.*

Judge Pagán dissented. He "disagree[d] that any error [had] occurred below," and further opined that, "if there was error, it was harmless." *Id.* at 143 (Pagán, J., dissenting). In addition, Judge Pagán thought that "expanding the doctrine of requiring *sua sponte* striking of testimony beyond unequivocal vouching" was unwarranted, and that the applicable factors weighed against exercising discretion to address the error in this case. *Id.*

We allowed review to address the appropriate application of plain-error review in this context.

## II.   DISCUSSION

### A.   *Standard of Review*

We employ "two different standards of review" in determining whether the Court of Appeals properly reversed on plain-error review. *State v. Gornick*, 340 Or 160, 167, 130 P3d 780 (2006). First, we consider "whether the Court of Appeals committed an error of law in determining that the three elements under the first step of the plain error analysis [have] been satisfied." *Id.* (citing *Ailes*, 312 Or at 382). Second, we consider whether the Court of Appeals abused its discretion in reversing based on that error. *Id.* If the Court of Appeals exercises its discretion to reverse on plain-error review, it "must articulate its reasons for doing so." *Ailes*, 312 Or at 382.

In *Ailes*, we identified the following nonexclusive list of factors that an appellate court may consider in deciding whether to exercise its discretion to reverse on plain-error review: "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served[.]" 312 Or at 382 n 6. Those factors "do not comprise a necessary or complete checklist; they merely are some of the permissible considerations." *Id.*

We have held that the Court of Appeals abused its discretion in reversing on plain-error review without evaluating the appropriate factors. *State v. Fults*, 343 Or 515, 522-23, 173 P3d 822 (2007). And we have frequently warned that the decision to reverse based on a plain error "'should be made with utmost caution'" because it "'is contrary to the strong policies requiring preservation and raising of error.'" *Gornick*, 340 Or at 166 (quoting *Ailes*, 312 Or at 382); *see also Vanornum*, 354 Or at 630-31 (same). Thus, it is "'only in rare and exceptional cases'" that an appellate court should reverse based on an error that had not been raised in the trial court. *Gornick*, 340 Or at 166 (quoting *Hotelling v. Walther*, 174 Or 381, 385-86, 148 P2d 933 (1944)).

B.   *The First Step of Plain-Error Review*

Under the first step of the *Ailes* framework, the Court of Appeals was required to determine whether the admission of Miguel's testimony regarding the FSTs without an adequate foundation constituted a plain error. To make that determination, the court must examine the following three factors: "(1) whether the claimed error [was] one of law; (2) whether the claimed error [was] obvious and not reasonably in dispute; and (3) whether the claimed error appears on the record." *State v. Chitwood*, 370 Or 305, 311, 518 P3d 903 (2022); *see also Vanornum*, 354 Or at 629 (listing factors and explaining that an error is not apparent on the record if it requires the reviewing court to "choose among competing inferences").

Determining whether the admission of Miguel's testimony about the FSTs constituted a plain error begins with the foundational requirements for FST evidence that we adopted in *O'Key*. There, we held that evidence about the defendant's performance on a different FST—the horizontal gaze nystagmus (HGN) test[8]—is scientific evidence that is admissible in a DUII case to establish that a defendant was

---

[8]  As explained in *O'Key*, the HGN test "is designed to detect whether a person's eyes demonstrate nystagmus under certain conditions." 321 Or at 294. Nystagmus is a physiological phenomenon involving an involuntary rapid movement, often described as jerking or bouncing, of the eyeball. HGN arises from an eye's inability to maintain visual fixation—resulting in observable jerking or bouncing of the eyeball—as the eye tracks a steadily moving object such as a finger or pencil across a horizontal plane of vision. *Id.*

under the influence of intoxicating liquor, "subject to a foundational showing that the officer who administered the test was properly qualified, the test was administered properly, and the test results were recorded accurately[.]" 321 Or at 322.[9] In reaching that conclusion, we discussed the development of the HGN, walk-and-turn, and one-leg-stand tests in some detail.

As we explained, those FSTs were developed by the Southern California Research Institute (SCRI) for the National Highway Traffic Safety Administration (NHTSA) in the 1970s. *O'Key*, 321 Or at 309. In 1981, another SCRI study for NHTSA standardized the procedures for administering and scoring those FSTs. *Id.* at 310.[10] The Oregon State Police (OSP), acting in consultation with the Board on Public Safety Standards and Training pursuant to authority delegated by the legislature, has approved the three foregoing field sobriety tests and others, and has adopted rules describing how the FSTs should be administered. *Id.* at 289-90 (describing rule making process); OAR 257-025-0012(1) (listing approved FSTs); OAR 257-025-0020(1) (describing procedures for administering FSTs).

Although the approved FSTs have common origins, we also explained in *O'Key* that there is a significant difference between the HGN test and the two FSTs that are at issue in this case. Specifically, we noted that, although the function of the HGN test, "like [the] other field sobriety tests, is to spot 'observable symptoms' or 'signs' of alcohol impairment," the HGN test "rests on a manifestation of alcohol consumption [that is] not easily recognized or understood by most people." *Id.* at 297. In contrast, the walk-and-turn and the one-leg-stand tests "obtain their legitimacy from effects of intoxication based on propositions of common knowledge." *Id.* We noted that such propositions included "commonly known observable symptoms or signs of alcohol

---

[9] We further concluded in *O'Key* that HGN evidence is not admissible to prove that a defendant had a BAC of .08 percent or more. 321 Or at 322-23.

[10] One study concluded that the HGN test was the most accurate of the FSTs, with an accuracy rate of 77 percent, compared to 68 percent for the walk-and-turn test and 65 percent for the one-leg-stand test. *O'Key*, 321 Or at 310 (citing Comment, *Can Your Eyes Be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom*, 84 J Crim L & Criminology 203, 209-10 (1993)).

intoxication" that are sufficiently accepted that a court may take judicial notice of them. *Id.* (citing *State v. Clark*, 286 Or 33, 39-40, 593 P2d 123 (1979) (internal quotation marks omitted)).[11]

We further discussed the walk-and-turn and one-leg-stand tests in *State v. Mazzola*, 356 Or 804, 820, 345 P3d 424 (2015), where we held that exigent circumstances made the warrantless administration of roadside FSTs in a DUII investigation constitutionally permissible. In reaching that conclusion, we described the rationale behind the admission of the FST results in a DUII case:

> "Psychomotor [field sobriety tests] test balance and divided attention, or the ability to perform multiple tasks simultaneously. While balancing is not necessarily a factor in driving, the lack of balance is an indicator that there may be other problems. Poor divided attention skills relate directly to a driver's exercise of judgment and ability to respond to the numerous stimuli presented during driving. The tests involving coordination (including the walk-and-turn and the one-leg-stand) are probative of the ability to drive, as they examine control over the subject's own movements."

*Id.* at 818 (quoting *United States v. Horn*, 185 F Supp 2d 530, 558 (D Md 2002) (brackets in *Mazzola*)). We also noted that the legislature had defined "field sobriety test" in ORS 801.272 as "a means of detecting impairment." *Id.*

It follows from our discussion of the walk-and-turn and the one-leg-stand tests in *O'Key* and *Mazzola* that, because the legislature has approved those tests as a means of detecting impairment and they are designed to spot observable symptoms or signs of alcohol intoxication that are easily recognized and understood by most people, law enforcement officers who are trained to administer those FSTs can generally testify about their training, how they conducted the tests, what they observed about a suspect's performance, and the conclusions they reached from those observations. That testimony is subject only to the

---

[11] In *Clark*, this court took judicial notice of 11 common physical manifestations of intoxication: (1) odor of the breath; (2) flushed appearance; (3) lack of muscular coordination; (4) speech difficulties; (5) disorderly or unusual conduct; (6) mental disturbance; (7) visual disorders; (8) sleepiness; (9) muscular tremors; (10) dizziness; and (11) nausea. 286 Or at 39-40.

foundational showing "that the officer who administered the test was properly qualified, the test was administered properly, and the test results were recorded accurately." *O'Key*, 321 Or at 322.

The Court of Appeals concluded, however, that Miguel went further when she testified that the walk-and-turn and one-leg-stand tests are "nationally standardized" tests that are "designed to determine impairment," and that they are supported by "studies conducted to prove their validity." That testimony, the court concluded, was "scientific" evidence that required an additional foundational showing to establish its scientific validity. Under our prior cases, determining whether evidence is "scientific" evidence, thereby requiring an additional foundational showing, generally "depends primarily on whether the trier of fact will perceive the evidence" as scientific. *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003). We acknowledge that, by invoking "the vocabulary of scientific research," *id.* at 563, Miguel's testimony may have "implied that it was grounded in science" and it is possible that the jury "would have viewed the evidence that way," *State v. Henley*, 363 Or 284, 301, 422 P3d 217 (2018).

However, Miguel's testimony in its entirety was less likely to be perceived as "scientific" than the expert testimony that we addressed in *Marrington* and *Henley*.[12] The fact that law enforcement officers are trained to administer the walk-and-turn and one-leg-stand tests in a standardized way—one that has been approved by NHTSA and is described in OSP rules—is a fact that, standing alone, does not impermissibly suggest that the tests are grounded in science. Similarly, the fact that those tests were authorized by the legislature to "detect probable impairment," ORS 801.272, does not necessarily suggest that they are grounded in science. On the other hand, it is possible that a jury could have understood from the terminology that Miguel used in describing the FSTs that they were sufficiently grounded in

---

[12] *Marrington* involved expert testimony explaining why children often delay reporting sexual abuse. *Henley* involved expert testimony about how pedophiles often "groom" children for sexual activity. In both cases, we held that the testimony was "scientific" evidence that required a foundational showing of scientific validity before the testimony could be admitted into evidence.

science to require an additional foundational showing, as the Court of Appeals concluded.

In any event, we need not decide whether the trial court plainly erred in receiving that testimony without an additional foundation if, assuming that the error was plain, the case can be resolved at the second step of the *Ailes* framework. We have employed that approach in other cases.

For example, in *Fults*, the Court of Appeals had reversed a sentencing error on plain-error review. We, in turn, reversed the Court of Appeals by assuming that the error was plain and concluding that the Court of Appeals had abused its discretion by reversing "based on the single rationale that it [had] expressed[.]" 343 Or at 523. Similarly, in *State v. Ramirez*, 343 Or 505, 173 P3d 817 (2007), the trial court had imposed an enhanced sentence without submitting the enhancement factors to the jury. The Court of Appeals reversed on plain-error review and remanded for factfinding on the enhancement factors. We reversed the Court of Appeals, stating that "it is more expeditious to assume" plain error and "to move directly to the second half of the *Ailes* analysis, *viz.*, a determination whether the Court of Appeals properly exercised its discretion to review the alleged error." *Id.* at 512. Considering the applicable *Ailes* factors, we concluded that the Court of Appeals had abused its discretion because, among other things, "it would not advance the ends of justice" to remand for additional factfinding since the evidence supporting an enhanced sentence was "overwhelming." *Id.* at 514.

We will employ that approach here.[13] Assuming that the error was plain, we will address whether the Court of Appeals abused its discretion in reversing based on its articulated reason. As we will explain, reversing based solely on a conclusion that a plain error was not harmless is inconsistent with the analytical framework that we adopted in *Ailes* and have consistently applied in our post-*Ailes* cases, and

---

[13] The concurring opinion takes issue with that approach, concluding that the error here was plain. That might be correct, but, because Miguel's testimony was less likely to be perceived as scientific than the expert testimony at issue in our prior cases, we do not consider the answer at step one of the *Ailes* analysis to be as clear as the concurring opinion suggests.

is contrary to the approach the Court of Appeals itself had previously adopted.

C.    *Exercising Discretion to Reverse on Plain-Error Review*

As noted above, when the Court of Appeals exercises its discretion to reverse on plain-error review, it "must articulate its reasons for doing so." *Ailes*, 312 Or at 382. Here, the Court of Appeals explained that it exercised its discretion to reverse because it "[could] not say" that Miguel's testimony about the FSTs had little likelihood of affecting the verdict, so the error "was not harmless."[14] *Ortiz*, 325 Or App at 142. But that is not a legally sufficient reason to reverse on plain-error review.

By reversing at step two of the *Ailes* plain-error framework based on its conclusion that the error was not harmless, the Court of Appeals failed to recognize the difference between an error that requires reversal and one that might permit reversal. Under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court may not reverse a criminal defendant's conviction based on an error—whether preserved or unpreserved—that is harmless. An error is considered harmless for purposes of that constitutional standard if "there was little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). When an appellate court determines that there was little likelihood that an unpreserved error affected the verdict, the court must affirm, regardless of whether that error satisfies the criteria for plain error.[15] Determining that an error is not harmless is necessary for reversal, regardless of whether the error was preserved or unpreserved.

---

[14] The Court of Appeals was skeptical that the state "could have laid an adequate *Brown/O'Key* foundation for Miguel to testify as a scientific expert had defense counsel objected to the evidence." *Ortiz*, 325 Or App at 142.

[15] We have explained that a preserved evidentiary error "does not require reversal if it is harmless—that is, if it had little likelihood of affecting the verdict." *Henley*, 363 Or at 307. The Court of Appeals has regularly applied that principle in affirming based on the harmlessness of a plain error. *See*, *e.g.*, *State v. Belen*, 277 Or App 47, 55, 369 P3d 438 (2016) (stating that, in determining whether to exercise discretion to correct a plain error, "[w]e begin with harmlessness, because, in this case, that issue is dispositive"); *State v. Ross*, 271 Or App 1, 12, 349 P3d 620, *rev den*, 357 Or 743 (2015) (affirming because "[t]he asserted plain error was harmless").

But that determination alone does not provide sufficient grounds for reversal on plain-error review because the court may not exercise its discretion to reverse based solely on its conclusion that a plain error was not harmless. That standard applies to reversal based on a preserved error. To reverse based on an unpreserved, plain error, the court must, in addition to determining that the error was not harmless, consider the factors that are relevant to the court's exercise of discretion at step two of the *Ailes* framework. Applying the same standard for reversal—that the error simply not be harmless—regardless of whether the error was preserved or unpreserved would essentially eliminate the second step of the *Ailes* analytical framework.

One of the factors listed in *Ailes*—the gravity of the error—may include an assessment that to some degree reflects the constitutional harmlessness standard, because, as discussed above, the court would be required to affirm if it determined that a plain error was unlikely to have affected the verdict. But the cases that formed the basis of the *Ailes* framework illustrate that the analysis is different when the court determines that the gravity of an unpreserved error warrants reversal. As we will explain, under those cases, the gravity of an unpreserved error warrants reversal where it is necessary to ensure that the ends of justice are satisfied under the circumstances. That determination is different than merely determining that reversal would be constitutionally permissible.

We adopted the *Ailes* framework by "[e]xtrapolating" from *State v. Brown*, 310 Or 347, 800 P2d 259 (1990). *Ailes*, 312 Or at 382. In *Brown*, a jury had convicted the defendant of the aggravated murder of a witness and sentenced him to death. We concluded on direct appeal that "the trial court committed reversible error when it failed to instruct on the causation element of aggravated murder of a witness." 310 Or at 356. Reversal was appropriate even though the defendant had not objected to the failure to instruct the jury on that element because "the ends of justice [would] not otherwise be satisfied." *Id.* at 355. We explained that the ends of justice warranted reversal in that case because the trial court's failure to instruct on causation "may have led the

jury to convict [the] defendant without having found that the victim's status as a witness motivated the murder in any way[,]" and we considered the error to be highly prejudicial "because the missing element makes the difference between life and death." *Id.* at 356.

Our decision in *Brown* cited *State v. Avent*, 209 Or 181, 183, 302 P2d 549 (1956), for the proposition that an appellate court should determine whether the "ends of justice" warranted reversal based on an unpreserved error. In *Avent*, the defendant had raised unpreserved evidentiary and instructional errors on appeal from her second-degree murder conviction. This court declined to review those errors, emphasizing that the rule against considering unpreserved errors "will not be relaxed unless the court, upon an examination of the entire record, can say that the error is manifest and that the ends of justice will not otherwise be satisfied." 209 Or at 183.[16]

In constructing our current plain-error framework, *Ailes* incorporated the standards that we had applied in *Brown* and *Avent* by including "the gravity of the error" and "the ends of justice" among the factors to be considered at step two of the analysis in deciding whether to exercise discretion to reverse based on a plain error. *Ailes*, 312 Or at 382 n 6 (citing *Brown*, 310 Or at 355-56, and *Avent*, 209 Or at 183). In applying those factors, several of our cases addressing unpreserved errors—both before and after *Ailes*—illustrate the difference between determining when the gravity of an unpreserved error justifies reversal to satisfy the ends of justice and determining that such an error was not harmless under the constitutional standard.

In one case, decided only a year after *Ailes*—*State v. Jensen*, 313 Or 587, 837 P2d 525 (1992)—the defendant

---

[16] That standard was not met in *Avent* because the instructional error was "obviously an inadvertence" and "would undoubtedly have been corrected" if it had been called to the trial judge's attention. 209 Or at 183. The unpreserved evidentiary errors did not justify reversal, because, among other things, defendant's "felonious intent [was] conclusively shown by the fact that she pulled the trigger five times" in killing the victim. *Id.* at 187. Thus, the court concluded that the "ends of justice" did not require consideration of those claimed errors, stating that, "[u]nless it is to be held that a person who shoots and kills another *** is to be excused because she testified that she intended no harm to her victim, *** there is no reason for this court to depart from customary procedure" to consider the unpreserved errors. *Id.* at 188.

challenged his conviction for first-degree assault and criminal mistreatment, assigning error to the trial court's admission of a nurse's testimony about statements made by the three-year-old victim. On appeal, the defendant raised an unpreserved Confrontation Clause challenge to that testimony. The Court of Appeals considered that issue, reversing and remanding for factual findings regarding the victim's availability. This court reversed, citing two cases—*Ailes* and *State v. Hickmann*, 273 Or 358, 540 P2d 1406 (1975)—and concluding, without further explanation, that the Court of Appeals had "erred in reaching defendant's confrontation argument." *Jensen*, 313 Or at 599.

In *Hickmann,* the trial court had granted a defendant's motion to suppress evidence obtained from a warrantless search, concluding that, although the police had probable cause to search the defendant's residence for drugs, there were no exigent circumstances that justified doing so without a warrant. The Court of Appeals agreed but remanded to the trial court to make findings on an issue that had not been previously raised—whether the defendant had consented to the search. We reversed, concluding that a remand to consider the issue of consent was not appropriate because "a question not raised and preserved in the trial court will not be considered upon appeal unless upon an examination of the entire record the court can find that the error is manifest and that the ends of justice will not otherwise be satisfied." 273 Or at 360.[17]

Thus, in both the genesis of the *Ailes* framework and in one of our first cases applying it, we concluded that reversal on plain-error review could be appropriate where the gravity of the error warrants reversal to satisfy the ends of justice under the circumstances presented in a particular case. That does not mean that the ends of justice is the *only* factor at step two of the *Ailes* framework. But we have never stated that the Court of Appeals, exercising its discretion

---

[17] *Hickmann* cited two earlier cases for that proposition, *State v. Abel*, 241 Or 465, 406 P2d 902 (1965), and *State v. Rupp*, 251 Or 518, 446 P2d 516 (1968). In *Abel*, this court declined to consider unpreserved evidentiary errors, stating that an unpreserved error will not be considered on appeal unless the court finds that the error "is manifest and that the ends of justice will not otherwise be satisfied." 241 Or at 467. In *Rupp*, this court declined to review an instructional error for the same reason. 251 Or at 519.

on plain-error review, may reverse based solely on its determination that an error is not harmless under the constitutional standard.[18]

Subsequent cases applying the *Ailes* analytical framework confirm that discretion to reverse based on an unpreserved error should be exercised with "utmost caution" and only when justified by the factors identified in *Ailes*, rather than based on a determination that the error was not harmless. For example, in *Vanornum*, we indicated that determining whether an unpreserved error was plain "is only half of [the] two-part inquiry." 354 Or at 630. The second step—determining whether to exercise discretion to review the error—"entails making a prudential call that takes into account an array of considerations, such as the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice in the particular case." *Id.* Ultimately, we explained, "a decision to review a plain error is one to be made with the 'utmost caution' because such review undercuts the policies served by the preservation doctrine." *Id.* at 630-31 (citing *Ailes*, 312 Or at 382).

Similarly, in *Fults*, the Court of Appeals had exercised its discretion to reverse a plain sentencing error, explaining only that "the state has no valid interest in requiring [a] defendant to serve an unlawful sentence." 343 Or at 523 (brackets omitted).[19] Accepting that statement "in the abstract," we pointed out that "other factors also must be considered and may outweigh that one." *Id.* We indicated that this court "has spelled out in the past precisely what it expects, and what it will look to, respecting an appellate court's choice to exercise its discretionary authority"

_____

[18] In *State v. Lotches*, 331 Or 455, 471-72, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001), we cited *Brown* in reversing convictions on two counts of aggravated murder based on unpreserved instructional errors. We remanded those counts to the trial court for further proceedings under *Brown* without discussing the factors listed in *Ailes*, asking "whether there was a substantial likelihood of jury confusion as to the underlying felony that was applicable to each count," *id.* at 470, and concluding that the instructional errors were plain and were "not harmless," *id.* at 472. That use of the term "harmless" was based on our assessment that the error was prejudicial in a way that required reversal, even in a plain error context.

[19] The sentencing error in *Fults* was the imposition of a 36-month term of probation on a charge carrying a presumptive sentence of 24 months' probation.

to consider an unpreserved error. *Id.* at 521. Specifically, we had "spelled out" the factors in *Ailes*. *Id.* at 522 (quoting *Ailes* factors and emphasizing that exercising discretion to consider unpreserved error "should be made with utmost caution"). We concluded that the Court of Appeals' decision to reverse an unpreserved error, "based on the single rationale that it [had] expressed, was an abuse of discretion." *Id.* at 523.

The "harmless error" approach to the exercise of discretion employed by the Court of Appeals to reverse in this case is inconsistent with those decisions and has been expressly rejected by the Court of Appeals' own precedent. In *State v. Inman*, 275 Or App 920, 928, 366 P3d 721 (2015) (en banc), *rev den*, 359 Or 525 (2016), the Court of Appeals concluded that it "need not decide whether the trial court plainly erred" in admitting without objection testimony challenged on appeal as vouching, because the court "would not exercise [its] discretion to correct any plain error that might exist on this record." In reaching that conclusion, the court applied the appropriate standards for plain-error review. *Id.* (noting that, under *Ailes*, the decision to exercise discretion to address an unpreserved claim of error "should be made with utmost caution because such an action is contrary to the strong policies requiring preservation and raising of error" (internal quotation marks omitted; brackets omitted)); *id.* at 928-29 (noting that, in *Fults*, 343 Or at 521-22, and in *Vanornum*, 354 Or at 630-31, this court had "expressed its continued agreement with, and intent to adhere to" that standard (internal quotation marks omitted)).

Applying *Ailes*, the Court of Appeals had first considered "the gravity of any error that could be said to have plainly occurred," *Inman*, at 929, concluding that, because the vouching testimony at issue was not an "emphatic or repeated comment on credibility," any error was "not nearly as grave as the errors that prompted reversals" in other vouching cases, *id.* at 933. Next, the court considered "the policies behind the general rule requiring preservation of error," *id.* at 934, explaining that the judicial system's interests in requiring preservation and avoiding unnecessarily repetitive legal proceedings are "weighty," *id.* at 935. In

assessing those interests, the court explained that "the ease with which any error could have been avoided or corrected should be a significant factor in an appellate court's decision whether to exercise its discretion to correct a plain, but unpreserved, error." *Id.* The court then considered "the last factor" that it saw as pertinent to the case: "the ends of justice." *Id.* at 936. The court concluded that "the ends of justice militate against such an exercise of discretion in this case" when the gravity of any error—its significance in the context of the case—was outweighed by the fact that a retrial could easily have been avoided by a timely objection, given the strong interests supporting preservation and avoiding such a retrial. *Id.*

The court then addressed a dissenting opinion's suggestion that the court should reverse on plain-error review because the admission of the vouching testimony "could not be characterized as 'harmless' in the context of this case[.]" *Id.* at 936. The court acknowledged that any error in admitting the testimony "might not be deemed harmless if [the court was] considering its effect in the context of a preserved evidentiary objection." *Id.* But, the court explained, "the harmless-error analysis does not govern our discretionary decision about whether to address unpreserved claims of error. Instead, we must balance the gravity of any error, in the context of the 'nature of the case,' against the other factors set forth in *Ailes*, *Vanornum*, *Fults*, and other plain-error cases." *Id.*

Shortly after the Court of Appeals' decision in this case, that court applied *Inman* in addressing an unpreserved instructional error raised as plain error on appeal. *State v. Horton*, 327 Or App 256, 535 P3d 338 (2023). There, the court first concluded that the instructional error "was not legally 'harmless[.]'" *Id.* 264. That meant only that the court "ha[s] discretion to correct the error, if [it] so choose[s][.]" *Id.* But, the court explained, under its decision in *Inman*, "the harmless-error analysis does not govern [the court's] discretionary decision about whether to address unpreserved claims of error." *Id.* Instead, the court explained that it must balance the gravity of any error, in the context of the nature of the case, against the other *Ailes* factors. *Id.* (citing *Inman*,

275 Or at 936). The *Horton* court was "ultimately unper-
suaded that the gravity of the error, the ends of justice, or
the other relevant considerations warrant[ed] exercising \*\*\*
discretion to reverse and remand" for a new trial. *Id.* at 266.

Thus, in both *Horton* and *Inman*, the Court of
Appeals correctly considered the appropriate *Ailes* factors
in deciding whether to exercise its discretion to reverse
on plain-error review, concluding in both cases that the
harmless-error analysis did not govern its discretionary
decision. In this case, the court did not consider the *Ailes*
factors, choosing instead to reverse based solely on its con-
clusion that the error was not harmless. In doing so, the
court abused its discretion.

D.   *The Appropriate Disposition of This Case*

In *Fults*, after concluding that the Court of Appeals
abused its discretion in reversing the defendant's sen-
tence on plain-error review based on its stated reasons, we
remanded to the Court of Appeals because we could not say
that the court "could not, after weighing all the relevant fac-
tors, justify its choice in some different way." 343 Or at 523.
Similarly, in *Vanornum*, after concluding that the Court
of Appeals erred in determining that it could not consider
an instructional error on plain-error review, we remanded
to the Court of Appeals to determine in the first instance
whether, in its discretion, it should consider defendant's
claim of plain error. 354 Or at 631.

We employ the same approach here and remand
this case for further proceedings. On remand, the Court of
Appeals should consider the relevant *Ailes* factors, consis-
tent with the approach described in this opinion and applied
by the Court of Appeals in *Inman* and *Horton*, to decide
whether to exercise its discretion to reverse for a new trial
based on the unpreserved evidentiary error it identified. If
the court declines to exercise its discretion to reverse on that
error, it should, if necessary, address defendant's remaining
assignment of error on appeal.

The decision of the Court of Appeals is reversed,
and the case is remanded to the Court of Appeals for further
proceedings.

**DUNCAN, J.,** concurring.

I join Justice James's concurrence through "Part I."

**JAMES, J.,** concurring.

I concur with the majority that the Court of Appeals erred in articulating reasons sufficient to support its exercise of discretion to correct an error under our plain error doctrine as articulated in *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). The doctrine of preservation—of which plain error is a subcomponent—and the doctrine of harmless error are distinct. They serve different purposes and derive from different sources. The Court of Appeals stated that one reason for its exercise of discretion to waive preservation to correct the error here under the plain error doctrine, was that the error was not harmless. That flaw in articulated reasoning is sufficient to vacate the decision and remand.

However, I part ways with the majority in its decision to assume, without deciding, that the claimed error in this case qualified under the first prong of *Ailes* as plain and obvious error apparent on the record. While certainly the majority is within its discretion to assume, but not decide, that issue, I would exercise my discretion differently. In my view—for the benefit of the bench and bar, and to develop our doctrine of plain error—we should answer that question.[1]

As I will explain, the testimony here, describing the walk-and-turn and the one-leg-stand tests as "standardized tests" that are "designed to determine impairment" and supported by "studies conducted to prove their validity," purported to be scientific evidence. Under *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984), and *State v. O'Key*, 321

---

[1] I am reminded of Justice O'Connor's observation, in her concurrence in *City of Ladue v. Gilleo*, 512 US 43, 60, 114 S Ct 2038, 129 L Ed 2d 36 (1994), that the practice of assuming without deciding carries certain consequences, including lost opportunities to develop and refine the law in an area. *See id.* at 60 (O'Connor, J., concurring) ("I would have preferred to apply our normal analytical structure in this case, which may well have required us to examine this law with the scrutiny appropriate to content-based regulations. Perhaps this would have forced us to confront some of the difficulties with the existing doctrine; perhaps it would have shown weaknesses in the rule, and led us to modify it to take into account the special factors this case presents. But such reexamination is part of the process by which our rules evolve and improve.")

Or 285, 299-306, 899 P2d 663 (1995), Oregon courts have an enhanced gatekeeping role with respect to scientific evidence that is not present when faced with nonscientific evidence. That enhanced gatekeeping role requires trial courts to ensure, even in the absence of an objection by the parties, that an adequate foundation exists in the record to establish the reliability of scientific evidence before such evidence can be admitted into an Oregon trial. When faced with unpreserved evidentiary challenges on appeal, whether the evidence was scientific should therefore properly be considered by an appellate court as one, among many, factors in exercising its discretion at the second step of *Ailes*.

## I.   THE TESTIMONY WAS SCIENTIFIC

In *Brown*, we said that scientific evidence was "evidence that draws its convincing force from some principle of science, mathematics and the like." 297 Or at 407. In *State v. Henley*, 363 Or 284, 301, 422 P3d 217 (2018), we elaborated that "[e]xpert evidence is 'scientific' under OEC 702 when it is expressly presented to the jury as scientifically grounded."

The issue in this case is testimony by the officer that the "standardized tests" he performed were "designed to determine impairment" and supported by "studies conducted to prove their validity." The Court of Appeals concluded that testimony was scientific by relying on *Brown*, *Henley*, and three of its own cases—*State v. Beltran-Chavez*, 286 Or App 590, 614, 400 P3d 927 (2017), *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019), and *State v. Reid*, 312 Or App 540, 541, 492 P3d 728 (2021).

In *Beltran-Chavez*, the Court of Appeals considered officer testimony that the defendant had "failed" the walk-and-turn test. There, the Court of Appeals rejected an argument from the state that the term "failed" was not explicitly scientific so as to trigger the concerns of *Brown*:

"Expert testimony that implicitly rests on scientific propositions can have just as much persuasive power as testimony that makes its scientific backing explicit. *** The propositions underlying an expert's testimony are a critical focus of the inquiry, not merely the words of the testimony. ***

As we understand it, that is a focus of the inquiry because the jury will understand that the expert's testimony rests on underlying propositions about the topic of the testimony and, because the expert is knowledgeable about the topic, is likely to believe that those propositions are correct."

*Beltran-Chavez*, 286 Or App at 613-14.

In *Eatinger*, the Court of Appeals applied *Henley* and *Beltran-Chavez* in considering officer testimony that, while performing Field Sobriety Tests (FST), the defendant's raising his arms was "an indicator." 298 Or App at 634. The officer testified that "[t]hese are all clues when they do the scientific validation and the training." *Id.* at 640. The Court of Appeals held:

"[H]ad the state limited [the officer's] testimony to his observations of defendant's performance on the FSTs, there is little question that the admission of that testimony would have been appropriate. The state—and, subsequently, the trial court—did not, however, limit [the officer's] testimony in that way. And, applying to that testimony the distinction that our case law has drawn between, on the one hand, expert testimony based on training and experience, and, on the other hand; testimony that is scientific, we are persuaded that [the officer's] testimony was scientific. Indeed, we do not view this to be a particularly close case. Although an implication that an officer's testimony is 'guided by principles grounded in science' may, under certain circumstances, suffice to render that testimony scientific, * * * here, [the officer] expressly testified as to the 'scientific validation' of the 'clues' he had observed during defendant's performance of the FST's; he also expressly adopted the prosecutor's statement that the FSTs were 'the product of scientific research.' More than just implying that his testimony was based on science rather than simply his training and experience, [the officer] expressly—and repeatedly—made that point."

*Id.* at 644.

Finally, in *Reid*, the Court of Appeals considered a plain error challenge to the admission of officer testimony that a defendant had "failed" the FSTs. 312 Or App at 542. Specifically, the testimony presented was as follows:

"[PROSECUTOR:]   And out of these eight steps, how many—out of all the—any steps that can be detected, how many would—what would be the amount that would be detected that would be considered a fail?

"[OFFICER:]   Four. Again, we take—we take a totality of the circumstances in the test, so again, they may not demonstrate—for example on this the horizontal gaze nystagmus test, there's six clues, I didn't observe any here, I didn't expect to observe any on this particular test. So that's what we're looking for, a failure on the specific test, but that doesn't—I take into account the other tests as well."

*Id*. (brackets in *Reid*).

Based on *Henley*, *Beltran-Chavez*, and *Eatinger*, the state in *Reid* conceded that the testimony was plain and obvious error apparent on the record, under *Ailes*, and that the Court of Appeals would be properly within its discretion to correct the error. *Id.* at 541.

In this case, the Court of Appeals' majority applied that line of precedent to conclude that the error here qualified as plain error under *Ailes*. In my view, and in respectful disagreement with the compelling dissent authored below by Judge Pagán, the Court of Appeals' majority was correct. The officer's testimony here drew its force from five critical terms—"standardized tests," "designed," "studies," "proof," and "validity." When presented together, as they were, those terms unquestionably invoke the aura of scientific grounding. A reasonable jury would likely understand such testimony to imply a reliance on a "principle of science, mathematics and the like." *Brown*, 297 Or at 407. In light of our decisions, as well as the Court of Appeals' decisions discussed, that error was plain, obvious, apparent on the record, and not reasonably in dispute. Accordingly, the legal error here opened the door to the Court of Appeals' discretion to correct under the second prong of *Ailes*.

## II.   *AILES* DISCRETION AND SCIENTIFIC EVIDENCE

Trials are intended to be fair and neutral grounds upon which litigants can try their cases. As I have written before:

> "[I]t is the litigants' case to try, not the court's. Every time an appellate court reverses on plain error for something not raised at trial, it sends a signal that the trial court, in that instance, should have *sua sponte* injected itself into that litigation. \* \* \* Trial courts are rightly concerned, as are we, about the effect on the perception of neutrality that occurs when a court intervenes in the parties' litigation in that way."

*State v. Burris*, 301 Or App 430, 434, 456 P3d 684 (2019). Those considerations always lurk behind an appellate court's decision to exercise *Ailes* discretion.

However, although it is the role of the court to ensure fairness, it is critical to recognize that fairness is not something owed only to the parties. Fairness is owed to the public as well, so that faith in the integrity and legitimacy of court proceedings, and court decisions, is maintained. In some instances, ensuring the legitimacy of trial proceedings may be in tension with allowing litigants to try their cases in the manner they wish. Sometimes, preserving the integrity of the proceeding requires a more active role by the trial court. The admission of scientific evidence is such an instance.

From 1923 until 1984, Oregon courts followed the admissibility standard for scientific evidence that was established by *Frye v. United States*, 293 F 1013, 1013 (DC Cir 1923). Under *Frye*, scientific evidence could be introduced in court proceedings if it was demonstrable and was generally accepted by the relevant scientific community. This meant that the science must have passed through the experimental phase and have "gained such standing and scientific recognition among \* \* \* [relevant] authorities as would justify the courts in admitting expert testimony." *Frye*, 293 F at 1014; *see also* Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence:* Frye v. United States*, A Half-Century Later*, 80 Col Law Rev 1197, 1205 (1980) (explaining that *Frye* "envisions an evolutionary process leading to the admissibility of scientific evidence"). Under that test, the relevant scientific community evaluated and determined the validity of the proffered scientific evidence, rather than trial court judges. Trial court judges simply had to determine whether the science had gained sufficient acceptance in the relevant community to warrant admission to trial. The *Frye*

test "dominated the admissibility of scientific evidence for more than half a century." *Id*. at 1205.

In 1975, with the promulgation of the Federal Rules of Evidence, the *Frye* standard began to decline in prominence. The rules were written with a "liberal thrust" and had a "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert v. Merrell Dow Pharms., Inc.*, 509 US 579, 125 L Ed 2d 469 (1993). In the aftermath of the adoption of the federal rules, courts were mixed in their interpretations about whether they conflicted with or could exist alongside the *Frye* standard.

Nine years after the passage of the federal rules, this court changed Oregon's standards for the admission of scientific evidence and expert testimony in *Brown*, 297 Or at 438. This court "rejected the *Frye* standard of 'general acceptance in the scientific community' as an unnecessarily rigid concept" in determining the admissibility of scientific evidence. *Id*. We defined "[t]he term 'scientific' *** [as] evidence that draws its convincing force from some principle of science, mathematics and the like." *Id*. at 407. We then established seven factors to be "used in connection with the definition of 'relevancy' as defined in OEC 401 and to be utilized in determining the helpfulness test for expert testimony expressed in OEC 702." *Id*. at 438. General acceptance in the relevant scientific community—the key determination in the *Frye* test—was made to be "one of seven factors to be considered in determining the relevancy of scientific evidence."[2] *Id*. at 417. Once a trial court establishes that the scientific evidence

---

[2] Specifically, in *Brown*, we stated:

"To determine the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702, the following seven factors are to be considered as guidelines:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

297 Or at 417.

is relevant, it can move to the second step in determining the admissibility of scientific evidence; the second step is to decide if the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *Id.* The framework of *Brown* is still in place today. However, this court updated that framework in *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), which I discuss further below.

Federally, the *Frye* test was overruled 70 years after it was initially established, in *Daubert*. The Court adopted a more "relax[ed]" and "liberal" standard derived from the Federal Rules of Evidence. *Daubert*, 509 US at 580. In contrast to the *Frye* standard, the rules do not give "any indication that 'general acceptance' [was] a necessary precondition to the admissibility of scientific evidence." *Id.* Instead, the Court established that the rules "place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 579-80.

In *Kumho Tire Co. v. Carmichael*, 526 US 137, 119 S Ct 1167, 143 L Ed 2d 238 (1999), the Court expanded the applicability of *Daubert*; the court "conclude[d] that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." 526 US at 141. And, as Justice Scalia made clear in his concurrence, a trial court's discretion under *Daubert* was only as to "choosing the manner of testing expert reliability[,] *** not discretion to abandon the gatekeeping function. *** [I]t is not discretion to perform the function inadequately. Rather, it is discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky." *Id.* at 158-59 (Scalia, J., concurring).

*Daubert* fundamentally changed federal trial court judges' evidentiary responsibilities, requiring them to take on an enhanced gatekeeping role in deciding whether to admit scientific evidence. Prior to *Daubert*—and under the

*Frye* test—trial court judges took a more neutral role in determining the validity of scientific evidence. Instead of trial judges evaluating the legitimacy of scientific evidence, the relevant scientific community was charged with accepting or denying the accuracy of evidence. Judges under *Frye* were simply asked to evaluate whether the scientific evidence had been sufficiently accepted by that community.

Now, under *Daubert*, trial court judges must "act as evidentiary gatekeepers" to ensure that scientific evidence is relevant and valid and does not detract from the fairness of the trial by "mak[ing] a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert,* 509 US at 580. This enhanced gatekeeping role of trial courts is widely recognized. As one scholar noted, *Daubert* "require[es] judges to evaluate the science in scientific evidence" and "makes judges responsible for the validity of the evidence in their courtrooms." Erica Beecher-Monas, *Blinded by Science: How Judges Avoid the Science in Scientific Evidence*, 71 Temp L Rev 55 (1998). Professor Beecher-Monas continues:

> "The first prong of the Court's analysis thus *requires* judges to critique scientific evidence and separate the wheat of valid scientific methodology from the chaff of chicanery. ***
>
> "*****
>
> "According to the Supreme Court, the judge must be able to examine the logic behind the expert's proffered testimony without taking sides on its outcome. Not the expert's conclusions, but the principles and methodology underlying the proposed testimony are to be the object of judicial scrutiny."

*Id*. at 62-63 (footnotes omitted; emphasis added).

Other scholars have reached similar conclusions:

> "*Daubert* clearly establishes that trial judges must evaluate expert scientific testimony 'at the outset,' and that their analysis should focus on whether the testimony constitutes 'scientific knowledge that... will assist the trier of fact to understand or determine a fact in issue.' Justice

Blackmun's opinion requires [courts] to undertake 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue[.]' * * *

"* * * * *

"Properly applied, the *Daubert* test should mean a deeper and more detailed preliminary review of scientific claims than most courts have heretofore undertaken."

Bert Black *et al.*, *Science and the Law in the Wake of* Daubert: *A New Search for Scientific Knowledge*, 72 Tex Law Rev 715, 721 (1994) (footnotes omitted); *see also*, Sophia I. Gatowski *et al*, *Asking the Gatekeepers: A National Survey of Judges on Judging Expert Evidence in a Post-*Daubert *World*, 25 Law and Hum Behav 433, 436 (2001) ("In *Daubert*, the Court explicitly placed judges in the role of 'gatekeepers' who evaluate the scientific validity and reliability of scientific evidence * * * *Daubert's* central premise is that judges can, and must, decide whether proffered scientific testimony is based on the scientific method without taking a position regarding the veracity of particular scientific conclusions."); Edward K. Cheng & Albert H. Yoon, *Does* Frye *or* Daubert *Matter - A Study of Scientific Admissibility Standards*, 91 Va Law Rev 471, 472 (2005) (Stating that "the enduring legacy of the *Daubert*" is that it requires "judges to scrutinize scientific evidence more closely.")

After the United States Supreme Court issued *Daubert*, this court adopted a similar rule for admitting scientific evidence in *O'Key*. In *O'Key*, this court noted that FRE 702, which the Supreme Court had used as the basis for *Daubert*, "is identical to OEC 702." 321 Or at 292. Based on that, we stated that the "decisional process to be applied for admission and exclusion of scientific evidence articulated in *Daubert* is, in our view, an appropriate further development of the decisional process that we first discussed in *Brown*." *Id.* at 306. Therefore, we specified that "an Oregon trial court, in performing its vital role as 'gatekeeper' pursuant to OEC 104(1), should, therefore, find *Daubert* instructive." *Id.* at 306-07.

Importantly, we made clear that the enhanced gatekeeping role of Oregon courts faced with proffered scientific evidence was mandatory. As we stated, drawing from *Daubert*, courts "faced with a proffer of expert scientific testimony, *must* determine at the outset, pursuant to FRE 104(a), whether the proposed evidence is based on scientifically valid principles and is pertinent to the issue to which it is directed." *Id.* at 302-03 (emphasis added).

We recently reaffirmed the active, not passive, role Oregon courts play in screening scientific evidence in *Marcum v. Adventist Health*, 345 Or 237, 244, 193 P3d 1 (2008). There, we held that:

> "In ruling on admissibility, the trial court performs the 'vital role' of 'gatekeeper,' screening proffered scientific testimony to determine whether it is sufficiently valid, as a matter of science, to legitimately assist the trier of fact and 'exclud[ing] 'bad science' in order to control the flow of confusing, misleading, erroneous, prejudicial, or useless information to the trier of fact.'"

*Id.* (brackets in *Marcum*; internal citation omitted).

In light of *Daubert* and *O'Key*, the active role the trial court plays in screening scientific evidence changes some of the fundamental assumptions of how, and when, a trial court should involve itself in evidentiary matters, despite the failure to object by the parties. In my view, this, in turn, changes some of the fundamental assumptions about the propriety of exercising discretion to correct unpreserved error on appeal. In *Ailes* we noted that exercising discretion to correct plain error "is contrary to the strong policies requiring preservation and raising of error." *Ailes*, 312 Or at 382. This is true, but there is an equally strong countervailing policy of the court's obligation to gatekeep the admission of scientific evidence in Oregon, regardless of the parties' objections.

Similarly, in *Ailes*, we noted that exercising discretion to correct plain error "undercuts the established manner in which an appellate court ordinarily considers an issue, *i.e.*, through competing arguments of adversary parties with an opportunity to submit both written and oral arguments to the court." *Id.* But, again, in the context of scientific evidence, *Daubert* and *O'Key* require the gatekeeping function of courts

be conducted regardless of the parties' objections. *Daubert* and *O'Key* charge courts, not parties, with ensuring valid science, and *only* valid science that is relevant and helpful to the jury, enters the courtroom. Litigants in Oregon cannot consent to infect Oregon trials with junk science, quackery, or any evidence that seeks the imprimatur of science in the eyes of the jury without an adequate foundation that the evidence has first been subjected to rigors of the scientific process. Because of this, exercising discretion to correct plain error involving scientific evidence does not "undercut[] the established manner" of things, at least to the same degree, as might be present when an appellate court exercising discretion to reverse unpreserved nonscientific evidentiary error.

This is not to say that an appellate court *must* correct unpreserved evidentiary errors involving scientific evidence; far from it. The discretion to correct unpreserved error under the second prong of *Ailes* is just that—discretion. "Discretion" refers to the authority of a trial court to choose among several legally correct outcomes. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). However, to be properly exercised, discretion must flow from a correct legal premise. *See, e.g.*, *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987). Further, in exercising discretion, a court can err if it "fails to exercise discretion, refuses to exercise discretion[,] or fails to make a record which [sufficiently supports] an exercise of discretion" *Id*. This case is an example of a record failure as to the reasons articulated in support of discretion. Accordingly, I have chosen to write separately in this case because, in my view, considering the nature of a trial court's role in gatekeeping scientific evidence adds a nuance to the legal premises underlying *Ailes* discretion, and may affect how an appellate court chooses to articulate its reasons for exercising, or not exercising, that discretion. These musings may, or may not, be taken up by the Court of Appeals on remand. But they ultimately do not change how we must dispose of this case. I indicated at the beginning the reasoning provided by the Court of Appeals in this case was flawed. The majority correctly reverses on that basis, and I therefore respectfully concur.

Masih, J., joins in this concurring opinion, and Duncan, J., joins in this concurring opinion through "Part I."